In the Interest of Z.L.R.,

**R.M., Appellant,**

v.

**Greene County Juvenile Office, Respondent.**

**No. SD 29946.**

Missouri Court of Appeals,
Southern District,
Division Two.

Feb. 3, 2010.

Motion for Rehearing or Transfer to
Supreme Court Denied Feb. 23, 2010.

Application for Transfer Denied
April 20, 2010.

James R. Sharp, Springfield, for Appellant.

Jason J. Lessmeier, Springfield, for Respondent.

Before SCOTT, C.J., LYNCH, P.J., and DALLY, Sp.J.

## PER CURIAM.

R.M. (Father) appeals the termination of his parental rights to Z.L.R. (Child) on statutory grounds of abandonment, abuse/neglect, and parental unfitness. We review to determine if the judgment is supported by substantial evidence and not against the weight of the evidence, and whether the trial court erroneously applied or declared the law. *In re C.A.M.*, 282 S.W.3d 398, 404 (Mo.App.2009).

1. Statutory references are to RSMo as amended through 2008.

2. We view the record favorably to the judgment (*C.A.M.*, 282 S.W.3d at 401) and describe the salient evidence accordingly.

3. Father had gone to jail in March 2007. The mother visited him soon thereafter and said she was pregnant, but never talked with him

## Termination of Parental Rights— General Principles

 Termination of parental rights is a two-step process. First, a § 211.447[1] statutory basis must be proven by clear, cogent, and convincing evidence, which is " 'evidence that instantly tilts the scales in favor of termination' " when weighed against the opposing evidence and leaves the factfinder " 'with the abiding conviction that the evidence is true.' " *C.A.M.*, 282 S.W.3d at 405 (quoting *In re S.M.H.*, 160 S.W.3d 355, 362 (Mo. banc 2005)).

 If a statutory basis for termination is proven, the second step is to decide if termination is in the child's best interest, which need be shown only by a preponderance of the evidence. *Id.*

## Background[2]

Child was born October 8, 2007. Her mother's condition and behavior caused hospital staff to call the Children's Division (Division) which took Child into protective custody. The mother said Father was the biological father and was in the county jail, where a caseworker reached him by phone.[3] Soon thereafter, Father advised the caseworker that he was headed for prison and how to reach him there, and also identified relatives with whom Child might be placed.[4]

Father did all he could to stay in touch with the caseworker and Child after he reached prison. The caseworker so testified, and elaborated that:

again (they were not married). He thought she had been lying. After Child's birth, the Division and Father agreed to testing that proved he was the father.

4. Father has been in jail or prison most of his adult life, from a murder stint at age 17 through his current term for resisting arrest.

[Father] calls me at least once a month from jail, sometimes more than that. He's written letters to me, as well as to [Child], and he sent cards to [Child] on a regular basis. . . . He sent cards [to Child] for every holiday, and sometimes just cards in general. I mean, he's done what he can as far as that. . . . He sent a card for every holiday that there was, so probably six or seven. And he sent cards when [Child] was ill at certain times as well.

The caseworker did not want Child to see Father in prison, but often when Father's mother visited Child, Father talked to Child by phone. The caseworker said Father also calls her "to ask how [Child] is doing. . . . He just wants to know how she is doing." Father sent no money, but "had gifts—clothing, toys, items brought from his family on his behalf numerous times." The caseworker described Father as very interested in Child, very compliant with his court-approved treatment plan, and "really involved and active in this case, as best he can" while being incarcerated. She testified that Father had "done everything" that she and the Division asked of him.

The record also includes certificates of Father's participation or completion in prison of programs including Alcoholics Anonymous, Narcotics Anonymous, Commitment to Change (changing old behaviors and lifestyles), Living in Balance (drug education), Alternatives to Violence, Computer Literacy, Workplace Essential Skills, Houses of Healing, Inside Out Dads, and several prison ministries and bible programs. Father testified that he signed up for every program the prison offered, including a group therapy class which had not yet begun.

All such evidence was essentially uncontroverted and apparently credible, since the trial court commended Father three times after hearing it. After the evidence closed, the guardian ad litem also commended Father, but asked the court to terminate his parental rights "in [Child]'s best interest. She's been in a long-standing stable home."

I do appreciate everything that [Father] is doing. I do think that—as the Court has already mentioned on the record, he should be commended for all the efforts that he has taken, both within this case and in a broader sense in improving himself. But with an outdate that is two to three years away, keeping this case open and not having permanency for [Child] over the course of that period, I don't think would be in her best interest. So I would also recommend that his rights be terminated as in her best interest at this time.

The Division likewise complimented Father, yet urged termination of his parental rights in Child's best interest:

Judge, we would just ask the Court to—to terminate the rights. We feel that [Child]'s best interests are served by achieving some permanency, and we would submit that the evidence has shown that mom is either unable or unwilling to be a parent at this time for [Child], and that the father, though he has been making strides to improve himself in prison, the reality is that in the foreseeable future he's not going to be a viable option, and we just think that [Child] needs permanency sooner rather than later in her life.

Respondent claimed it had proven Father's abandonment, abuse/neglect, and parental unfitness despite the foregoing evidence, in that Father "didn't send any support or financial or in kind" and "there is no evidence of much of a bond, if any" between Child and Father. The court ultimately agreed and terminated Father's pa-

rental rights on all three grounds. Father challenges these findings *seriatim*.[5]

## Abandonment

■ Father attacks the weight and sufficiency of proof that he abandoned Child; i.e., that for "six months or longer ... without good cause, [Father] left the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so." § 211.447.5(1)(b). This court recently observed that abandonment has been described as:

a voluntary and intentional relinquishment of the custody of the child to another, with the intent to never again claim the rights of a parent or perform the duties of a parent; or ... an intentional withholding from the child, without just cause or excuse, by the parent, of his presence, his care, his love, and his protection, maintenance, and the opportunity for the display of filial affection.

*In re E.F.B.D.*, 245 S.W.3d 316, 324 (Mo.App.2008)(quoting *In re Watson's Adoption*, 238 Mo.App. 1104, 195 S.W.2d 331, 336 (1946)). "This largely presents an issue of intent, which is inferred from the parent's conduct." *E.F.B.D.*, 245 S.W.3d at 324.

Respondent claims the evidence "demonstrated that [Father] failed to maintain even a superficial or tenuous relationship with the child, thereby evidencing his intent to abandon the child," but this cannot be squared with the record. As to Father's intent, one is hard-pressed to find opposing evidence "that instantly tilts the scales in favor of termination" if Father

was "very interested" in Child; "very compliant" with his court-approved treatment plan; "really involved and active in this case, as best he can" while being incarcerated; did "everything" that the Division and its caseworker asked him to do; called and sent letters to both Child and the caseworker; sent cards to Child when she was ill and on every holiday; had his family bring clothing, toys, and gifts on Father's behalf "numerous times"; and completed enough self-improvement programs to earn the trial court's repeated commendations.

■■ The trial court found as follows: [Father] has failed to visit the child since she was born. The father sent two or three letters to the child as well as holiday cards. The father spoke with the child by telephone on a few occasions. The Court gives no weight to these infrequent contacts. The father failed to provide any financial or in-kind support for the child since she was born. The evidence established that the father had been incarcerated for the duration of the child's life. The Court finds that the father's incarceration was the result of the father's voluntary actions and is no justification or excuse for failing to provide even minimal support for the child or to communicate with the child. No evidence was presented of any inability on the part of the alleged biological father to provide at least minimal support for the child or to communicate with the child more frequently.

Such findings invoke established legal principles [6] that the evidence does not support.

---

5. Others whose parental rights were terminated by the judgment have not appealed. Those terminations and parts of the judgment are unaffected by our decision.

6. Incarceration, by itself, shall not be grounds for termination of parental rights. Nevertheless, an incarcerated parent's rights may be terminated, as incarceration does not discharge a parent's statutory obligation to

## Volition

Father concedes that his voluntary actions have put him in prison, but denies that he has sought an excuse not to communicate with or support Child. The weight of evidence supports Father on this, as shown above and hereafter. Father also distinguishes himself from parents who commit bad acts *after* they have children and should realize such acts have consequences harmful to those children. *See, e.g., In re A.P.S.*, 90 S.W.3d 232, 235 (Mo.App.2002).[7] Child may suffer from Father's absence, but getting in trouble *before* he knew about Child is no proof that Father *now* wants no relationship with her.

## Communications

The court's finding that Father "sent two or three letters . . . as well as holiday cards" minimizes the caseworker's undisputed testimony that Father "sometimes just [sent] cards in general. I mean, he's done what he can as far as that. . . . He sent a card for every holiday that there was, so probably six or seven. And he sent cards when [Child] was ill at certain times as well."

Short of unauthorized contact with Child from prison, we are uncertain what more the trial court would have had Father do. Since Child was only 18–months old at the time of the termination hearing, she likely could not understand Father's cards and letters, but Father still sent them. Also,

the record indicates that Father spoke to Child by phone on more than "a few occasions," and given Child's age, it seems doubtful that more calls would have meant more to her.

## Financial Support

Father earned about 28¢ daily, but sent Child no money. An inmate is expected to contribute toward his child's support, not to make a real financial difference, but to show the parent cares. *R.P.C. v. Wright County Juvenile Office*, 220 S.W.3d 390, 394 (Mo.App.2007); *see also J.M.S.*, 83 S.W.3d at 84 (small contribution may not significantly aid child, but shows parent's desire to maintain a relationship).

On this record, however, Father's non-payment is *de minimis* and cannot fairly be said to prove his disinterest in Child. Father spent money to send Child cards, and his family gave Child clothing, toys, and gifts "numerous times" on Father's behalf. Part of the treatment plan was for Father to pay child support in an amount to be determined, and pending such determination to "contribute items, when financially able, such as clothing, toys, etc. for the support of his child." Until Father's child support amount was determined (and there is no indication that ever occurred), the actions of Father and his family seem understandable and reasonable.

The father in *J.M.S.* was on probation when his child was born. He committed

---

provide his child with a continuing relationship through communication and visitation, and parental rights may be terminated while the parent is incarcerated. Likewise, an incarcerated parent's substantially reduced wages do not excuse his obligation under section 211.447 to make monetary contributions toward support of his child. Although a minimal financial contribution from an incarcerated parent does not significantly aid in supporting the child, it does demonstrate the parent's intent to continue the parent/child relationship.

*In re J.M.S.*, 83 S.W.3d 76, 83–84 (Mo.App. 2002) (citations and quotation marks omitted).

7.	Respondent argues *A.P.S.*, but ignores the point that Father resisted arrest before he knew Mother was pregnant, so he could not have foreseen any effect on Child of his arrest. We agree with Father that *A.P.S.* and his case are different.

another crime two years later, was imprisoned, and the child went into juvenile care. 83 S.W.3d at 78. The father sent letters, cards, poems, pictures to color, and Christmas gifts to the child from prison, where the father completed his GED and participated in drug and alcohol abuse programs, bible studies, and classes on responsibility, relationships, and anger management. *Id.* at 79. The father earned $7.50 per month in prison, but sent no financial support. *Id.* at 80. The trial court terminated the father's parental rights on the ground of abandonment. The Western District reversed and stated:

> The trial court stated in its oral findings that Father should have at least sent a quarter in cash to J.M.S. each month as an indication that it was costing him to maintain a relationship with J.M.S. But the undisputed evidence showed that Father spent more than a quarter each month to correspond with J.M.S., and to J.M.S.'s maternal grandparents and DFS about J.M.S. Father's frequent correspondence, and the cost he incurred in maintaining this correspondence, demonstrated his intent to continue the parent/child relationship. Therefore, this court finds that Father's failure to send a portion of his $7.50 per month salary in cash to support J.M.S. is *de minimis* in light of the circumstances of this case and does not support a finding that Father left J.M.S. without parental support for a six-month period while he was incarcerated.

> Father's frequent correspondence also demonstrated that, while he was incarcerated, he did not leave J.M.S. without making any arrangements to visit or communicate with the child, although able to do so.

*Id.* at 84. This record compels similar conclusions. Respondent did not prove its abandonment allegations by clear, cogent, and convincing evidence. Termination of Father's parental rights on that basis must be reversed.

### Abuse/Neglect

■ The judgment's abuse/neglect findings addressed § 211.447.5(2)'s four factors. *See In re W.C.,* 288 S.W.3d 787, 795 (Mo.App.2009). The trial court found no evidence against Father on three of these: mental condition; chemical dependency; and physical, emotional, or sexual abuse toward Child. However, the court found against Father on the fourth factor,[8] and specifically that Father "failed to provide appropriate shelter, financial support, or in-kind support" after Child came into juvenile care and "there was no evidence" he was unable to do so.

We need not reiterate the weight of evidence of in-kind support provided on Father's behalf. His small prison income precluded meaningful financial support, and his failure to pay anything was *de minimis* per *J.M.S.* Father already was jailed when he first learned of Child, so he could not personally provide her shelter, but he proposed willing relatives whose home studies were approved. After the Division decided that a temporary placement change was not in Child's best interest, Father's relatives unsuccessfully sought a court order otherwise.

An extended discussion is unnecessary. Respondent did not prove by clear, cogent, and convincing evidence that Father abused or neglected Child. The court's

---

**8.** "Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development." § 211.447.5(2)(d).

finding of this statutory termination ground also must be reversed.

## Parental Unfitness

The trial court presumed Father's incarceration rendered him unfit to parent Child.[9] Father claims the evidence of a negative impact on Child was not sufficient for the court to so presume. Father is right in a manner of speaking, but it is more accurate to say the court misapplied the law. A different situation triggers § 211.447.5(6)'s presumption of unfitness, i.e., "a prior judicial determination that terminated the parental rights of the parent in another child because one or more of the enumerated statutory grounds for termination in section 211.447 existed." *In re A.H.*, 9 S.W.3d 56, 61 (Mo.App.2000). Incarceration in and of itself is not grounds for termination (§ 211.447.7(6)), as the trial court later acknowledged. Yet to presume Father unfit for being in prison and implicitly force him to overcome that presumption improperly shifted the burden of proof.

Parental rights are a fundamental liberty interest, and statutes providing for their termination "are strictly construed in favor of the parent and preservation of the natural parent-child relationship." *In re A.S.W.*, 137 S.W.3d 448, 453 (Mo. banc 2004). The erroneous presumption relieved Respondent of clearly, cogently, and convincingly proving Father's unfitness; improperly shifted to Father the burden of proving himself fit; skewed relevant findings and pretermitted others; and resulted in manifest injustice warranting reversal and remand of the § 211.447.5(6) parental unfitness findings for plain error. Rule 84.13(c).

## Best Interest

Despite Father's Point IV arguments, there was sufficient evidence for the trial court's finding that termination was in Child's best interest. This did not require clear, cogent, and convincing proof. A preponderance of the evidence was sufficient, and the record viewed favorably to the judgment met that standard. However, in light of cases like *In re K.A.W.*, 133 S.W.3d 1, 9–10 (Mo. banc 2004), we do not speculate whether such evidence alone (now some ten months old) may adequately prove Child's best interest at the time of future proceedings on remand.

9. In pertinent part, the parental fitness finding was that (our emphasis):

> [Father] is *presumptively* unfit to be a party to the parent and child relationship *due to specific conditions, namely [Father]'s incarceration resulting from his volitional activity,* that directly relate to the parent and child relationship and that are of a duration and nature that render [Father] unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs of [Child].... Given the fact that [Father] has been incarcerated throughout the entire duration of [Child]'s life, that he has been incarcerated the majority of his own adult life due to repeated convictions for a series of violent offenses, that he has failed to provide even minimal financial or in-kind support for [Child] during her lifetime, and that he will be incarcerated for a number of years as a result of his most recent conviction, the Court finds that [Father] has been and will be unable to care appropriately for the ongoing physical, mental, and emotional needs of [Child]. In light of the foregoing, the Court further finds that any further continuation of the parent-child relationship between [Father] and [Child] at this point is not in the best interests of [Child] and greatly diminishes [Child]'s prospects for successful integration into a permanent and stable home. The Court further finds that even if [Father] is granted an early release from his current five year sentence, there is little, if any, likelihood that he could, within an ascertainable period of time, complete services to the point that he would be able to assume the care, custody and control of [Child].

## Conclusion

The findings that Father abandoned, abused, or neglected Child, and the termination of his parental rights on those grounds, are reversed. The § 211.447.5(6) parental unfitness findings as to Father, and the termination of his parental rights to Child based thereon, are reversed and remanded for further proceedings not inconsistent with this opinion. In all other respects, the judgment is affirmed.