347 S.W.3d 601 (2011)
In the Interest of Z.L.R.
R.A.M., Appellant,
v.
Greene County Juvenile Office, Respondent.
No. SD 30881.
Missouri Court of Appeals, Southern District, Division One.
July 15, 2011.
Motion for Rehearing and Transfer Denied August 2, 2011.
Application for Transfer Denied October 4, 2011.
*602 Jim R. Sharp, Sharp & Bredesen, Springfield, MO, for Appellant.
Bill Prince, Springfield, MO, for Respondent.
GARY W. LYNCH, Judge.
R.M. ("Father") appeals the termination of his parental rights to Z.L.R. ("Child") on statutory grounds of parental unfitness (section 211.447.5(6)) and failure to rectify (section 211.447.5(3)).[1] Father contends that the doctrine of "law of the case" precludes the termination of his parental rights on the evidence presented, that the findings of parental unfitness and failure to rectify were not supported by substantial evidence and against the weight of the evidence, and that termination is not in Child's best interest. Finding no trial court error, we affirm the trial court's judgment.

Factual and Procedural Background[2]
Viewed in the light most favorable to the judgment, In the Interest of I.Q.S., 200 *603 S.W.3d 599, 603 (Mo.App.2006), the following evidence was presented at trial: Child was born October 8, 2007. Her mother's condition and behavior at the time of Child's birth caused hospital staff to call the Children's Division ("the Division"), which took Child into protective custody. Child's mother told the Division that Father was Child's biological father and could be found in the county jail. An investigator from the Division was able to reach him there by telephone.[3] Shortly thereafter, Father informed the Division that he was headed to prison and advised the Division on how to reach him there; at that time, Father also identified two of his relatives with whom Child might be placed.[4] Child was initially placed in a "traditional foster home" located in Greene County and has remained in that same foster home throughout these proceedings. The trial court determined that placement with Father's relatives was not in Child's best interest.
The Division filed a petition to terminate the parental rights of both Father and Child's mother on October 20, 2008, in the Circuit Court of Greene County. In that petition, the Division alleged that Father had abandoned Child by failing to maintain consistent contact with her and by failing to provide her with consistent financial or emotional support; that Father had abused/neglected Child because of his chemical dependency and his failure to provide Child with a safe, stable, and secure home environment; and that Father was unfit to be a party to the parent-child relationship because of his incarceration. The following March, Father's mother filed a motion to intervene, asking that Child be placed with her or, in the alternative, with Father's half-sister.
During the initial trial on the petition, which took place on April 8, 2009, Child's caseworker testified that
[Father] calls me at least once a month from jail, sometimes more than that. He's written letters to me, as well as to [Child], and he sent cards to [Child] on a regular basis. ... He sent cards [to Child] for every holiday, and sometimes just cards in general. I mean, he's done what he can as far as that. ... He sent a card for every holiday that there was, so probably six or seven. And he sent cards when [Child] was ill at certain times as well.
Child's caseworker did not want Child to see Father in prison, but often when Father's mother visited Child, Father talked to Child by telephone. Father also calls Child's caseworker "to ask how [Child] is doing. ... He just wants to know how she is doing." Although by his own admission, Father had not sent any money or gifts to Child at his own expense, he had "gifts clothing, toys, items brought from his family on his behalf numerous times." The caseworker went on to describe Father as very interested in Child, very compliant with his court-approved treatment plan, and "really involved and active in this case, *604 as best he can" while being incarcerated. She stated that Father had "done everything" that she and the Division had asked of him. She also stated, however, that Father had never met Child, and that there was not "any kind of bond or attachment between [Child] and [Father]." Child's caseworker recommended that termination of Father's parental rights to Child would be in Child's best interest because of the length of his incarceration and his lack of direct contact with Child. Child's guardian ad litem also recommended that termination would be in Child's best interest.
Evidence was also introduced of Father's participation in or completion of prison programs including Alcoholics Anonymous, Narcotics Anonymous, Commitment to Change (changing old behaviors and lifestyles), Living in Balance (drug education), Alternatives to Violence, Computer Literacy, Workplace Essential Skills, Houses of Healing, Inside Out Dads, and several prison ministries and bible programs. Father testified that he had signed up for every program the prison offered, including a group therapy class that had not yet begun.
The trial court, guardian ad litem, and Division all commended Father for his efforts, but the trial court ultimately terminated Father's parental rights on June 10, 2009, finding grounds of abandonment, abuse/neglect, and presumed parental unfitness. Shortly thereafter, the trial court denied Father's mother's motion to place Child in her care, citing the grandmother's age and "major health issues" as reasons she would be "unable to physically care" for Child, in addition to a lack of a bond between Child and her paternal relatives.[5]
This Court reversed the trial court's termination of Father's parental rights in In re Z.L.R., 306 S.W.3d 632 (Mo.App.2010) ("Z.L.R. I"). Specifically, we held that there was insufficient evidence to support the trial court's findings of abandonment and abuse/neglect and reversed the trial court's judgment as to those grounds. Id. at 637-38. We further held that the trial court had misapplied the law in presuming parental unfitness, and we remanded the case for further proceedings. Id. at 638-39.
Before the hearing after remand, held August 4, 2010, the Juvenile Office amended the petition for termination to include an allegation of failure to rectify. At the hearing, the trial court accepted into evidence the transcript from the initial termination trial. It further heard testimony from Child's caseworker, Father, and R.S., identified at one point as Father's half-brother-in-law.[6] It was adduced that, following the entry of the initial judgment terminating Father's parental rights, the decision was madeas a result of collaboration between the Division, Child's guardian ad litem, the Juvenile Office, and the trial courtthat Father should no longer be allowed to speak with Child on the telephone. That decision remained in place even after this Court's reversal of the initial judgment and remand. It was further adduced that Father continued to send cards and letters to both Child and her caseworker, and that Father's family continued to send Child gifts and meet with her once a month. The caseworker testified that Father never informed her of any plans for housing or a job upon his release. She also testified that Father had not shown "the ability to maintain suitable independent housing[,]" nor had he shown *605 "the ability to provide for the minor child's financial or emotional support." According to the caseworker, Child was still unaware of who Father was and refers to her foster parents as "Mom and Dad."
According to Father, following the initial termination of his parental rights, he continued to enroll in classes offered in prison, including "Impact of Crimes on Victims" and "Cycle of Change." Father admitted, however, that he has been ordered to pay $50.00 in child support per month and, although he receives an $80.00 check each month from his father, in addition to his $8.50 monthly prison wage, he has not paid any child support whatsoever. He further admitted that he has had trouble keeping jobs in the past and does not have a house or job lined up upon his future release from prison. He expected he would live with his mother in Springfield for some time following his release.
R.S. testified that he would be willing to employ Father at his auto body shop in Kansas City upon Father's release from prison and would pay Father $12.00 an hour. R.S. also testified that Father might be able to live with him until he was able to secure his own housing.
The trial court took the matter under advisement and ultimately entered its judgment on September 3, 2010, once again terminating Father's parental rights to Child. Finding that Father was unfit to parent, the trial court stated,
[Father] is unfit to be a party to the parent and child relationship because of specific conditions directly relating to the parent and child relationship that are of such a duration or nature as to prevent the father from providing for the mental, emotional, and physical needs of the child for the reasonably foreseeable future. Those conditions include the fact that due to [Father's] volitional criminal activity, the father has been incarcerated for the entirety of the minor child's life. The father has been incarcerated for fifteen of twenty three years of his adult life. The court recognizes that while incarceration alone is not a ground for termination of parental rights, it does not discharge a parent's obligation to provide a child with a continuing financial and emotional relationship. Here [Father] did neither. He has never had physical contact with the child and he has sent sporadic letters and cards. He has not provided even token support to the child on a regular basis. [Father] has never seen the child. The child does not know [Father] or have a bond with him. Assuming [Father] was out of prison and able to parent a child, this child is, for all intents and purposes, a stranger to him. The court finds it highly unlikely that from the date of trial [Father] could establish a bond with the child and demonstrate the ability to parent this child on a consistent basis in the reasonably foreseeable future.
The trial court also found that Father had failed to rectify the situation causing Child to be removed from the home, citing Father's failure to provide even token financial support or consistent in-kind support to Child; Father's failure to provide the trial court with any verification of prospective employment or housing upon his release from prison; and Father's volitional criminal activity giving rise to his being imprisoned, and thus unable to provide a home and care for Child. Finally, the trial court stated, "The child has no emotional relationship with [Father] and there is little likelihood that [Father] will be in the position to establish a relationship with and care for the child in a foreseeable period of time." This appeal followed.

Standard of Review
In order to terminate a parent's rights to his or her child, the trial court *606 must find by clear, cogent, and convincing evidence that at least one ground for termination exists pursuant to section 211.447; if at least one ground for termination is found to exist, the trial court must then determine if termination is in the best interest of the child. In the Interest of P.L.O., 131 S.W.3d 782, 788 (Mo. banc 2004). We review whether the statutory ground or grounds for termination have been proven by clear, cogent, and convincing evidence according to the standard set forth in Murphy v. Carron, 536 S.W.2d 30 (Mo. banc 1976). P.L.O., 131 S.W.3d at 788-89. "Thus, the trial court's judgment will be affirmed unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law." I.Q.S., 200 S.W.3d at 603. We review whether termination is in the best interest of the child for an abuse of the trial court's discretion. P.L.O., 131 S.W.3d at 789. "In all of these determinations, the appellate court is deferential to the trial court's findings of fact and considers all of the evidence and reasonable inferences from the evidence in the light most favorable to the judgment." I.Q.S., 200 S.W.3d at 603. We further defer to the trial court on issues of credibility, as the trial court is in a superior position to make such determinations. In re J.L.B., 9 S.W.3d 30, 37 (Mo.App.1999). The trial court is free to believe all, some, or none of the testimony of any witness. In re Adoption of W.B.L., 681 S.W.2d 452, 455 (Mo. banc 1984).

Discussion
Father presents four points for our review: first, the doctrine of "law of the case" precludes the termination of Father's parental rights to Child based upon the evidence presented; second, the failure-to-rectify finding and, third, the parental-unfitness finding were not supported by substantial evidence and were against the weight of the evidence; and, fourth, termination was not in Child's best interest. Our resolution of Father's third and fourth points is dispositive.[7]

Parental-Unfitness Finding Supported by Substantial Evidence
In his third point relied on, Father contends:
The trial court erred in terminating Father's parental rights on the ground that he is presumptively unfit to be a party to the parent-child relationship due to his incarceration because said finding was not based on substantial evidence and against the weight of the evidence[[8]] because there was no indication that Father's incarceration had, or would have, a negative impact on the child; that Father had shown his commitment to the child by providing, through his family, in-kind support and by keeping in contact with the child through cards and letters; that Father was prohibited by the Children's Division from contacting the child either in person or through telephone calls; that Father has completed numerous programs *607 in prison to counteract the causes of him being incarcerated; that the Children's Division's prohibition on any in-person or telephone contact between Father and the child prevented any bond from being developed between Father and his daughter; and that Father will be released from prison as early as March of 2011.
We disagree.
We first note that Father's contention that he was erroneously found to be "presumptively unfit" to parent Child is factually inaccurate. While this claim accurately reflects the first judgment of termination in our decision in Z.L.R. I, this Court expressly found there to be no presumption of parental unfitness due to a parent's incarceration.[9]Id. at 638. We further found that the trial court's express mistaken reliance upon such an incorrect presumption improperly shifted the burden of proof to Father. Id. We then remanded the case on the issue of parental unfitness to give the trial court the opportunity to weigh the evidence absent the color of such a presumption. Id. at 639. Trial courts are presumed to know and correctly apply the law, In re Adoption of C.M.B.R., 332 S.W.3d 793, 822 (Mo. banc 2011), and there is no mention of any presumption of unfitness in the trial court's judgment presently before us.
Also on this basis, Father's "law of the case" argumentdiscussed in his first point relied onas it pertains to the parental-unfitness ground, is without merit.
The doctrine of law of the case provides that a previous holding in a case constitutes the law of the case and precludes relitigation of the issue on remand and subsequent appeal. State v. Graham, 13 S.W.3d 290, 293 (Mo. banc 2000); Rodriguez v. Suzuki Motor Corp., 996 S.W.2d 47, 61 (Mo. banc 1999). The doctrine governs successive adjudications involving the same issues and facts. Shahan v. Shahan, 988 S.W.2d 529, 533 (Mo. banc 1999). Generally, the decision of a court is the law of the case for all points presented and decided, as well as for matters that arose prior to the first adjudication and might have been raised but were not. Graham, 13 S.W.3d at 293; Shahan, 988 S.W.2d at 533.
Walton v. City of Berkeley, 223 S.W.3d 126, 128-29 (Mo. banc 2007). Father contends that our first decision "reversed a judgment terminating Father's parental rights based on Father's incarceration[.]" This is inaccurate. In its initial judgment terminating Father's parental rights, the trial court incorrectly presumed Father to be unfit as a result of his incarceration and so found, without an examination of the totality of the facts as they pertained and applied to that particular ground. In Z.L.R. I, we reversed that finding and remanded to afford the trial court the opportunity to examine the evidence presented without any such presumption. Id. at 638. Thus, the "law of the case" regarding parental unfitness in this particular case is that there is no presumption of parental unfitness as a result of Father's incarceration, and the trial court's subsequent examination of the evidence presented both before and after such remand and its finding on remand comport with our instructions *608 in Z.L.R. I, i.e., the trial court examined the facts and ruled accordingly without inappropriately shifting the burden of proof to Father by applying a nonexistent presumption. See id.
Section 211.447.5(6) provides, in pertinent part, that termination is appropriate when:
The parent is unfit to be a party to the parent and child relationship because of a consistent pattern of committing a specific abuse ... or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental or emotional needs of the child.
Father has been incarcerated for the majority of his adult life for numerous felony convictions, which include second-degree murder and drug possession. It was during a six- or seven-month hiatus from prison that Child was conceived, and Father returned to incarceration immediately following her conception and has remained there for the entirety of Child's life.
"While incarceration alone shall not be grounds for termination of parental rights, section 211.447.7(6), it does not discharge a parent's obligation to provide the child with a continuing relationship through communication and visitation." In the Interest of T.W.C. and D.K.C., 316 S.W.3d 538, 541 (Mo.App.2010) (citing I.Q.S., 200 S.W.3d at 604). Father has never had any physical contact with Child. At the time of the hearing nearly a year ago, Child was almost three years old and closely bonded with her foster parents, whom she refers to as "Mom" and "Dad" and with whom she has lived since her birth. Although Father has attempted to forge a relationship with Child through telephone calls, cards, and letters, his efforts have been ineffective in fostering a bond between him and Child. According to her caseworker and guardian ad litem, Child does not know who Father is. While the trial court and Child's placement team were responsible for not allowing Child to visit Father in prison, Father acknowledged that it was his own volitional actions that put him in prison, thus creating the situation at hand.
Every child is entitled to a permanent and stable home. In re K.A.W., 133 S.W.3d 1, 9 (Mo. banc 2004). That such a home is of the utmost importance is underscored by the termination statute's inclusion of time limits regarding how long a parent has to create a stable home for his or her child. See, e.g., section 211.447.5(3) (stating that a parent has one year to rectify the situation that caused the child to be removed from the home and using the phrase "early integration into a stable and permanent home"); see also section 211.447.5(6) (using the phrase "reasonably foreseeable future").
In T.W.C., 316 S.W.3d 538, these time limits, coupled with the lack of a bond between parent and child, led the Western District of our Court to affirm the termination of an incarcerated father's parental rights notwithstanding his compliance with an incarcerated-parent treatment plan and corresponding efforts to foster a relationship with his children. In that case, the father, who had been incarcerated for most of his adult life, had been incarcerated since his children were four months old. Id. at 541. While he had had no physical contact with the children since that time, he frequently sent the children drawings, letters, and gifts; he also spoke with them on the telephone. Id. Nevertheless, the children did not know who he was, and a social worker testified that even though counseling and visitation could be provided following the father's release from prison which was scheduled for some two *609 months following the termination hearingthe process of cultivating a parent-child relationship would likely take years. Id. Moreover, she testified that "the first four years of life are critical for attachment" and separating a child from her foster parents, whom she considers her parents, and attempting to create a bond with a biological parentessentially a stranger"would be damaging to the child[] and could negatively affect" her for the rest of her life. Id. The Court ultimately held that the "[f]ather's absence from the children and the lack of a bond between him and the children render [the f]ather unable, for the reasonable future, to care appropriately for the children's ongoing physical, mental, or emotional needs[,]" affirming the termination of the father's parental rights on the ground of parental unfitness. Id.
The facts in T.W.C. are strikingly similar to those here. Father has been incarcerated for the majority of his adult life. Father sent Child numerous cards and letters and spoke with her via telephone. Child has had no physical contact with Father and does not know who Father is. Child has spent essentially the first four years of her life with her foster parents, to whom she is closely bonded and whom she views as her "Mom and Dad." These facts lead us to believe that, despite Father's efforts to foster the parent-child relationship through correspondence, that bond is not there, and the creation and nurturing of such a bond would simply take too long, if such a bond could be forged at all. See id.; see also In the Interest of K.M.W., 342 S.W.3d 353, 364 (Mo.App.2011) ("Sending items to a child does not guarantee a bond."). Such a lengthy and uncertain process flies in the face of the established goal of finding a stable, permanent home for Child as quickly as possible. See section 211.447; T.W.C., 316 S.W.3d at 541. There was substantial evidence before the trial court that Father's years-long absence from Child has prohibited the formation of the necessary parent-child relationship, and the trial court's decision that Father is unfit to parent Child within the reasonably foreseeable future based upon that evidence was not in error. Father's third point is denied.

Termination is in Child's Best Interest
In his fourth point relied on, Father contends:
The trial court erred in finding that it would be in the best interests of the minor child for Father's parental rights to be terminated because said finding was an abuse of the trial court's discretion in that Father had completed numerous programs to prevent the causes of him being incarcerated; Father is due to be released from prison as early as March, 2011 when he can be an active part of the child's life; Father's family actively pursued placement of the child during the time she has been under the jurisdiction of the trial court and is still active in the child's life; and termination of Father's parental rights would have the effect of terminating any contact the child may have with Father and his family who have been active in the child's life.
We disagree.
"The determination of what is in a child's best interest[] is an ultimate conclusion for the trial court based on the totality of the circumstances." In re K.J.K., 108 S.W.3d 62, 68 (Mo.App.2003). "This subjective assessment is not to be reweighed by appellate review[,]" In re D.M.B., 178 S.W.3d 683, 689 (Mo.App. 2005); rather, we examine the record for sufficient evidence demonstrating, by a preponderance of the evidence, that termination is in the child's best interest and will reverse on a finding of best interest *610 only if the trial court abused its discretion. Id. at 689-90.
Section 211.447.7 delineates seven factors the trial court must consider in determining whether termination is in the child's best interest. There is no requirement that all seven factors must be found adversely to the parent for termination to be in the child's best interest and, likewise, there is no minimum number of negative factors required for termination. In re C.A.M., 282 S.W.3d 398, 409 (Mo.App. 2009). In the case at bar, the trial court found unfavorably to Father on five of the seven factors: Child has no emotional ties to Father, having never met him; Father failed to maintain adequate visitation and contact with Child; Father has paid no child support and failed to provide even token financial or in-kind support for Child; Father's absence during the entirety of Child's lifenearly three years at the time of trial and nearly four years now has left no bond between Father and Child and no evidence was presented that Father would be in a position to parent Child within an ascertainable period of time, even with additional services; and Child would be deprived of a stable home for a period of years due to Father's incarceration. Contrarily, the trial court did find that Father had "articulated an interest in the child" and that there was no evidence that Father had deliberately subjected Child to a substantial risk of physical or mental harm. All of these findings are supported by evidence in the record, as evidenced supra, particularly when the record is viewed in the light most favorable to the judgment, as it must be. See I.Q.S., 200 S.W.3d at 603.
Father's argument on this point focuses solely on his own actions and those of his family as evidence that termination is not in Child's best interest; nowhere does Father discuss the potential impact of termination on Child, or even the impact his incarceration and resulting separation has had on Child. The best interest of Child, not Father, is what the trial court was charged with determining and what this Court must review. Moreover, Father's arguments against termination are not supported by the record. Father focuses the majority of his argument on this point on his family's efforts to obtain custody of and visit with Child, citing "successful home studies" in support. While two of Father's relatives were approved for placement via home studies conducted in each relative's home county, it was ultimately determined that placement with either relative was not in Child's best interest. The firstFather's cousin and his wifewas deemed an unsuitable placement because three residents of the home smoke and Child has respiratory problems. The secondFather's half-sister and her paramourwas deemed an unsuitable placement for numerous reasons, including: the couple's limited involvement with Child since her birth, namely that they had no contact with Child between April 5, 2008, and September 11, 2008, and only one visit with Child prior to that time period; the couple's failure to contact Child's caseworker or any other member of Child's placement team between April 5, 2008, and September 11, 2008; the couple's sluggish completion of necessary paperwork for the home study; the half-sister's inability to take off from work and Child's health problems, which cause Child to miss several days of daycare each month; the half-sister's apparent failure to understand the severity of Child's health problems; the half-sister's partner's apparent lack of interest in Child, as evidenced by his single visit with Child in December 2008; the half-sister's seeming disinterest in Child and disregard for her needs during visits; Child's close bond with her foster parents; and Child's lack of bond with the half-sister and her partner. The decision that *611 family placement was not in Child's best interest was initially determined by Child's placement team, but that decision was later confirmed by the trial court; the trial court's order denying family placement was not appealed.
Father also faults the Division for his lack of a bond with Child; the evidence of the absence of a parent-child relationship between Father and Child has been laid out in-depth supra. However, "a lack of bonding is substantial evidence supporting that termination is in the best interest of the child[.]" C.A.M., 282 S.W.3d at 408 (citing J.L.B., 9 S.W.3d at 36). While it is true that the Division limited Father's contact with Child, it is Father's own actions that resulted in his incarceration, which is the primary reason for the Division's limitations. Furthermore, the determination of the best interest of the child is not necessarily fault-based; rather, it is a "subjective assessment based on the totality of the circumstances." K.J.K., 108 S.W.3d at 68. The circumstances in this case reflect that Child has never met Father, does not know who he is, and is closely bonded with her foster parents; these circumstances exist regardless of who created them. We do not doubt Father's love for Child, but the love of a parent alone does not always reflect the ability of that parent to successfully parent his child. See C.A.M., 282 S.W.3d at 409.
Ultimately, we must view the evidence in the light most favorable to the judgment of termination, and we must "give deference to the [trial] court's ability and opportunity to judge the credibility of the witnesses[.]" J.L.B., 9 S.W.3d at 37. In that context, there is substantial evidence supporting the trial court's finding that termination is in Child's best interest, and the trial court did not abuse its discretion is making such a finding. Father's fourth point is denied.

Decision
The trial court's judgment is affirmed.
BARNEY, P.J., and FRANCIS, J., concur.
NOTES
[1] All statutory references are to RSMo Cum. Supp.2007.
[2] This Court affirmed in part, reversed in part, and remanded a previous judgment terminating Father's parental rights to Child in In re Z.L.R., 306 S.W.3d 632 (Mo.App.2010). We borrow freely from that opinion without further attribution.
[3] Father was jailed in March 2007 for resisting arrest. Shortly thereafter, Child's mother visited him there and told him she was pregnant; she never spoke with Father again. Father thought she had lied. After Child's birth, the Division and Father agreed to testing that ultimately proved him to be Child's biological father.

This was not Father's first incarceration; he had previously been incarcerated for second-degree murder, armed criminal action, and possession of methamphetamine, spending the majority of his adult life in confinement.
[4] Father provided the Division with the name of his half-sister in Kansas City, as well as a cousin living in Lebanon. Each relative, at least initially, expressed interest in caring for Child and satisfactorily completed a home study when Child was approximately six months old. Father's mother also expressed interest in caring for Child.
[5] Father's mother did not appeal this determination.
[6] It appears that Father's half-sister and her partner, R.S., were never actually legally married, but had been together for 27 years as of the time of the second hearing.
[7] Sufficient evidence of one ground is all that is needed to affirm a termination of parental rights; in such a situation, as here, it is unnecessary to address any remaining grounds. See In re A.M.C., 87 S.W.3d 917, 923 (Mo. App.2002).
[8] While Father challenges this ground as being against the weight of the evidence in his point relied on, he makes no argument supporting that challenge. See Houston v. Crider, 317 S.W.3d 178, 186-87 (Mo.App.2010) (an against-the-weight-of-the-evidence argument requires completion of four sequential steps). Contentions in a point relied on that are not developed in the argument section are deemed abandoned. Mortgage Elec. Registration Sys., Inc. v. Williams-Pelton, 196 S.W.3d 50, 52 (Mo.App.2005).
[9] There is, however, a presumption of parental unfitness if, within the three years "immediately prior to the termination adjudication, the parent's parental rights to one or more other children were involuntarily terminated pursuant to subsection 2 or 4 of this section or subdivisions (1), (2), (3) or (4) of subsection 5 of this section or similar laws of other states." Section 211.447.5(6). There is no evidence in the record to support the application of this presumption here.