

# Missouri Court of Appeals

## Southern District

### Division One

IN THE INTEREST OF )
I.R.S., B.L.S., and C.A.T.S. )
)
J.L.T., )
)
     Appellant, )  No. SD33150, SD33151 & SD33152
)     Consolidated
   vs. )
)  FILED: August 26, 2014
GREENE COUNTY JUVENILE OFFICE, )
)
     Respondent. )

APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

Honorable David C. Jones, Judge

*(Before Francis, C.J./P.J., Bates, J., and Scott, J.)*

**<u>AFFIRMED</u>**

PER CURIAM. Appellant (Mother) appeals the termination of her parental rights (TPR) to three children. The trial court found, in part, a § 211.447.5(3) "failure

to rectify" and that TPR was in each child's best interest.[1]  Mother's challenges to these findings fail.  We affirm.

## Failure to Rectify

Three years before the TPR hearing, the children came into juvenile care under circumstances described in ***In re I.R.S.***, 361 S.W.3d 444 (Mo.App. 2012).[2] Thus, a termination for failure to rectify required clear and convincing proof that:

1. The conditions that brought each child into care still persisted, *or* that other potentially harmful conditions still existed;

*and*

2. Those conditions were unlikely to be remedied soon enough for the child to be returned to Mother in the near future, *or* that continuation of their parent-child relationship would greatly diminish the child's prospects for early integration into a stable and permanent home.

***In re P.J.***, 403 S.W.3d 672, 675-76 (Mo.App. 2012); ***In re T.A.L.***, 328 S.W.3d 238, 247 (Mo.App. 2010); § 211.447.5(3).

The trial court found these elements and ruled unfavorably to Mother on each statutory factor that the court was required to consider.  *See* § 211.447.5(3)(a)-(d). We view the evidence and reasonable inferences most favorably to the judgments, ***I.R.S.***, 361 S.W.3d at 445, and will summarize the facts accordingly.

*Conditions That Led to Assumption of Juvenile Court Jurisdiction*

Mother lost her parental rights to two other children (not the subject of these cases) in Ohio in 2005.  I.R.S., who was born the following year, was under the jurisdiction of the Taney County juvenile division from August 2006 to May 2007

---

[1] Statutory citations are to RSMo 2000, as amended through 2013.  Rule references are to Missouri Court Rules (2013).

[2] Facts in our opinion's next section are taken from ***I.R.S.***, 361 S.W.3d at 445-47.

due to parental neglect. B.L.S., born in May 2007, and I.R.S. were under the jurisdiction of the juvenile division from June 2007 to November 2008 due to parental neglect. Mother's 18 referrals to the Missouri Children's Division ("CD") resulted in five investigations and eight informal services cases, the latest of which was closed at Mother's request in September 2010. Still, Mother's caseworker remained concerned about the children and Mother's parenting abilities. Services had not improved Mother's poor interaction with the children, nor remedied her belligerence or tendency to use services only as a means for transportation.

Mother's history of poor anger management and mental instability was ongoing. Such mental instability was, in part, why I.R.S. was placed in care in 2006. In 2007, shortly after taking the children into care in Taney County, the court appointed a guardian ad litem (GAL) for Mother. Later that year, a counselor noted Mother's unstable moods and symptoms of bipolar disorder. The family was offered informal services in 2010 due in part to concerns about Mother's mental instability. In November 2010, I.R.S.'s daycare reported difficulties working with Mother, who would get mad and hang up the telephone one day, then would call a few days later and act as if nothing had happened. Mother tried counseling, but did not follow through with the counselor's recommendations. She did not seek medication therapy despite strong professional advice in 2007 to do so.

Mother had limited prenatal care while pregnant with her youngest child, C.T.S.[3] She once called her doctor for pain medication, which was prescribed, but Mother would not take it because it was not the specific drug she wanted.

Mother and G.S. ("Father")[4] have a history of domestic strife. I.R.S. told her preschool teacher and a CD investigator that Mother called Father "evil." I.R.S. dreamt that Father would kill I.R.S., B.L.S., and Mother. In an April 2010 incident, Mother called Father at work and asked him to come home. When he arrived, Mother yelled at him, put the children outside, and locked the door. Father took the children to a restaurant. Mother called the police and reported that Father had abducted the children.

In June 2010, Father left the house because Mother was yelling at him as usual. Mother then called Father so many times that he turned off his cell phone. The next day, Mother—who was pregnant and driving with a revoked license with I.R.S. and B.L.S. as passengers—saw Father driving a truck. She chased him in her car, rammed into the truck, and blocked its path. She exited her car, started throwing items out of the truck bed, and did not calm down even after police arrived. Her complaint was that Father did not clean house or help care for the children.

In November 2010, 32 weeks into her pregnancy with C.T.S., Mother was transported to the hospital by ambulance due to bleeding, pain, and placental abruption. Within a few hours of arrival, she was complaining about not getting the

---

[3] Referred to in our caption as C.A.T.S.

[4] G.S. is the biological father of B.L.S. and C.T.S., and is listed as father on I.R.S.'s birth certificate. He has filed a separate appeal.

pain medication she requested and of needing a cigarette. She wanted her intravenous lines disconnected and threatened, against medical advice, to leave the hospital. She argued with Father and hospital security had to be called to separate them.

After she delivered C.T.S., Mother acted erratically and hysterically. She refused to take prescribed medications and again threatened to leave the hospital because she was not getting her painkiller of choice. A psychiatric consultation was ordered, during which Mother exhibited anxiety and symptoms consistent with bipolar disorder or Axis II pathology. Mother adamantly refused psychiatric assistance or to speak to a social worker, and continued to argue with Father while in the hospital.

Although Mother tried to brush them aside, a CD investigator and a deputy juvenile officer conducted a newborn crisis assessment at the hospital. Mother reported that she hated Father, that he had not lived with her during the pregnancy, and that she terminated informal services because they would not give her rides or watch the children for her. When juvenile authorities took protective custody of the children, Mother became irate, complained of prior grievances against the system, and said she loved Father and that they were working things out as a couple.

The juvenile officer filed petitions alleging that the children needed care and treatment due in part to Mother's mental health, anger management issues, and failure to seek appropriate prenatal care; her history of domestic disturbances with Father; and the family's history of involvement with the child-welfare system. Mother and Father appeared with counsel at a combined adjudication and

disposition hearing. The court found that the children were subject to its jurisdiction and entered judgments to that effect. These judgments were affirmed on interlocutory appeal. *I.R.S.*, 361 S.W.3d at 445-47, 450.

*After Assumption of Juvenile Court Jurisdiction*

The initial case goal was to reunite the children with their parents. To that end, a treatment plan was ordered for Mother.

Three times, the court ordered Mother to submit to psychiatric evaluation, but she never did. In late 2010, psychologist Mark Bradford evaluated Mother[5] and diagnosed mood disorder, borderline personality disorder, and antisocial personality disorder, among other things. Dr. Bradford's many recommendations included individual and couples counseling, parenting classes, cooperation with CD and the juvenile office, and demonstration of stable work and living arrangements. Mother could have begun to implement these within a few weeks.

In 2013, Dr. Bradford re-evaluated Mother after several "recent misses and no shows." Although the formal diagnosis was largely unchanged, Dr. Bradford testified that Mother "hasn't gotten any better. I think if anything, she's gotten worse."[6]

---

[5] Dr. Bradford had seen Mother previously (2006), but we do not have a copy of that evaluation or definitive testimony on diagnosis.

[6] Dr. Bradford said the same in his last written report:

> **Prognosis:** We are sad to report that [Mother] seems worse physically and mentally than the last time we saw her. She believes she has extraordinary physical problems which completely disable her, and require her to rush to emergency rooms, stay in a wheel chair. It is as if she is very depressed and choosing to manifest it via increasing health problems at least partially. She would deny this, but her frequent trips to the health clinics or emergency rooms, and her various physical complaints, suggests mental problems as a major part of the physical problems. It is very questionable when or if she can care for children with this profile.

For one thing, Mother still lacked insight into her circumstances. The children had been in foster care for more than two years, yet Mother still seemed not to appreciate why the children had been removed from her care or why they had not been returned. Dr. Bradford described Mother as "highly resistant of acknowledging there was ever a problem, period." Indeed, Mother repeatedly told her final counselor[7] that she (Mother) was an "exceptionally good" parent.

Mother also had become obsessed about physical illness. She claimed poor health, said she needed to use a wheelchair, and repeatedly sought tests for various medical conditions, largely yielding negative results. She went to an emergency room or community health center some 90 times in a span of 30 months. She would turn angry at doctors, especially when they would not prescribe her narcotics or told her something she did not want to hear. Once, Mother got so angry that security had to escort her out of the facility.

Dr. Bradford opined that Mother's physical ills may be psychological more than actual, and elaborated:

> I think that as time went on, she gravitated towards physical health problems as a substitute for being a mother. And I think those physical health problems gave her an escape, physical and psychological health problems gave her an escape from the responsibilities of being a parent, and allowed her to fulfill certain narcissistic impulses like pharmacological treatment of her anxiety.
>
> * * *
>
> So essentially she's become addicted to hospitals and drugs and various physical disorders to escape psychological problems and to escape personal blame for the inability to care for her children.

---

[7] Dr. Robert Gladden, whose further testimony is noted *infra*.

Dr. Bradford testified that Mother had become skilled "at telling doctors what they need to hear to get medicine."

Dr. Bradford described Mother is "a very demanding, needy, sick woman" who "seemed to never be getting better" and was "basically living a kind of an increasingly passive dependent life, demanding on others to take care of her." She becomes angry and paranoid when she does not get her way. In short, she is a "help rejecting complainer" who demands help but rejects it if it does not suit her.

Dr. Bradford noted how Mother's mental condition affected relationships with her children. Mother was not able to be responsible and consistent in parenting. She could get overwhelmed with her own issues and be unavailable to the children. If she would make herself available to the children, Mother would be very self-centered, easily irritated, and obsessive about her "sickness." As Dr. Bradford put it:

> As long as she continues to have this -- this obsessive look at all the physical things that she has wrong, this obsessive look towards having cancer or having this condition or that condition, as long as she continues to seek diagnoses or treatment, I think that's going to occupy her time. Her sickness will be her children. Her sickness will be her baby. And she'll have inadequate time for any other children.

Dr. Bradford expressed "grave concerns" that Mother could meet even minimum parenting standards, and deemed it "very questionable when or if she can care for children with this profile."

I.R.S.'s counselor predicted serious problems for I.R.S. if she were returned to Mother's care, telling the court:

I believe that we would see stunted development. I think we would see that she would have great trouble -- continued trouble with problem solving. I think that her ODD could possibly transition into conduct disorder and then transition into antisocial personality disorder as she got older, if nothing changed, if things remained as they are.

Some of these concerns were borne out during limited, supervised family visits. Mother typically wanted to control these visits, but she left the actual parenting to Father, with whom she often found fault and argued. As one parent aide put it, "when mom was at the visit, they tended to be everybody walking on eggshells because nobody wanted to upset mom, nobody wanted to say anything to get her going." The parent aide described "kind of a pattern" where Mother would get overwhelmed or irritated, Father would try to calm her, then Mother would "start in" on Father and berate him "[t]o the point that, you know, there was a couple times I had to get a worker to come in and help." Once, participants in a class down the hall "all came over to make sure that everybody over there was okay, because mom was yelling so loud." Most visits "ended with mom being upset, and the kids very well aware that mom was upset," according to this aide, who testified that "in my [17] years of doing this, I have not seen a mother who seems to be not really understanding what's going on during visits and how that's being seen by her children."

Dr. Gladden was the last of several therapists and counselors who tried to help Mother. At trial, he described Mother as bombastic, angry, hostile, conspiratorial, and persistently "argumentative and emotionally and verbally combative with others that are trying to take care of [the] children." Doggedly, Dr. Gladden kept trying:

9

"Like I say, about every third time, she would fire me and scream and yell. And I would come back the next week and I'd say, well, let's try it again." Yet Dr. Gladden noted that Mother "absolutely denied that she'[d] ever shown significant argumentative or disruptive behaviors."

Dr. Gladden testified that in 36 years of practice he never has "seen a mother this blindly unwilling to modify behavior," and opined that Mother could not meet minimal parenting standards: "I couldn't in any clinical professional way find it at all suitable to say that she could parent calmly, effectively, and continuously as what the children need." As much as Dr. Gladden might like to see this family reunited, he would not now put the children back "with a lady that is this out of control."

Other witnesses agreed that Mother's anger and behavior had gotten no better, and in some ways was worse, than when the children came into care. Between the third and fourth days of the TPR trial, police were dispatched to Mother's house because she was yelling at Father and physically preventing him from leaving. Even after an officer arrived, Mother continued to yell at Father and would not follow the officer's instructions. Notably, the officer testified that Mother showed no signs of medical disability or limitation and was not using a wheelchair. The officer was so concerned about Mother's mental stability that he considered placing her in a 96-hour involuntary mental health commitment.

In December 2013, more than three years after the children last came into care, the court terminated Mother's parental rights on multiple statutory grounds, including failure to rectify.

*Mother's Complaint and Analysis*

We reject Mother's scant argument that the failure to rectify findings are against the weight of evidence. Mother claims she complied with the "important portions" of her treatment plan and disputes the finding that she consistently refused to change her behavior. But it is more accurate, on the record as we must view it, to say Mother completed *some* of the treatment plan without making significant progress on the whole. Partial treatment plan compliance does not preclude TPR for failure to rectify. **In re G.G.B.**, 394 S.W.3d 457, 470 (Mo.App. 2013). Further, the trial court was entitled to credit repeated testimony that Mother did not change her behavior, at least not for the better.

Also flawed is Mother's attack on findings about her mental condition. The trial record, above-summarized only in part, adequately supports all three prongs of such findings (documentation, duration, and severity of effect). *See **In re T.L.B.**,* 376 S.W.3d 1, 12 (Mo.App. 2011). Oddly, Mother opines that the trial court must have doubted the proof, since that court did not *sua sponte* appoint her a GAL when mental conditions ascribed to her, in Mother's own words, "point to a very disturbed person."[8] Suffice it to say that the trial court's detailed findings leave no doubt or ambiguity about how it weighed the evidence and witness credibility on this issue.

---

[8] We reject Mother's plain error claim that a GAL should have been appointed for her. Mother cites § 211.462.2's mandate for a GAL if a parent is a minor or incompetent, but she was neither. That a GAL was appointed for Mother in a prior case does not prove that this trial court erred (much less plainly erred) in not doing so *sua sponte* here. Finally, Mother's failure to suggest any prejudice – let alone manifest injustice or a miscarriage of justice – dooms this point. Rule 84.13(c).

Even less meritorious is the complaint that the court's chemical dependency finding "was gleaned entirely" from Mother's medical records that were in evidence and to which she raises no objection on appeal.

But much more to the point, Mother "fails to set forth a viable against-the-weight-of-evidence argument as she merely sets forth selective evidence contrary to the trial court's finding while ignoring favorable evidence and the trial court's credibility determinations." *In re I.G.P.*, 375 S.W.3d 112, 126 (Mo.App. 2012). As in other contexts, this failure to take account of our standard of review robs Mother's argument of persuasiveness or analytical value. *See Ivie v. Smith*, No. SC93872, slip op. at 19 (Mo. banc July 8, 2014); *J.A.R. v. D.G.R.*, 426 S.W.3d 624, 632 (Mo. banc 2014); *Houston v. Crider*, 317 S.W.3d 178, 189 (Mo.App. 2010). Given the gravity of a TPR judgment, we have reviewed the record *ex gratia* to be sure these are not the "rare" cases warranting against-the-weight reversal. *Ivie*, slip op. at 13. They are not. An overwhelming volume of evidence supports the trial court's failure to rectify findings and its judgments as a whole.

Extended discussion is unnecessary. Mother's sole challenge to this statutory ground for termination fails. Thus, we need not reach her challenges to the neglect finding as one statutory ground is enough to sustain a TPR judgment. *In re J.L.G.*, 399 S.W.3d 48, 63 (Mo.App. 2013).

### Best Interest

Mother's one-paragraph argument against the best interest findings, once again, fails to consider our standard of review and "makes [her] challenge to the circuit court's best interest findings of no analytical or persuasive value." *J.A.R.*,

426 S.W.3d at 632. Also once again, *ex gratia* review confirms that Mother is not entitled to relief. The above-cited evidence amply refutes her complaint; other proof further supports the court's findings.

I.R.S.'s counselor testified that Mother and I.R.S. do not have a healthy relationship. The counselor was concerned that I.R.S. was enmeshed with Mother to the extent that I.R.S. believed she had to feel what Mother was feeling. I.R.S. was insecure in part because she strove to please Mother but always fell short. Mother's behaviors contributed to I.R.S.'s emotional and behavioral difficulties, according to the counselor, who remained in favor of no contact between I.R.S. and Mother.

B.L.S. had behavior problems and was delayed in her education, but was "doing much better" in her current placement – progressing, doing well in school, and behaving better. B.L.S. wants to be part of a family and has raised the issue of adoption with her counselor.

C.T.S. has never lived with Mother and apparently does not know who she is. Lack of bonding is substantial evidence that termination is in the child's best interest, even if the parent's opportunities to bond were limited. *In re Z.L.R.*, 347 S.W.3d 601, 611 (Mo.App. 2011).

All the children had been in care at least three years at the time of the TPR hearing. C.T.S. had been in care his whole life. This was the third time in foster care for seven-year-old I.R.S.; the second time for six-year-old B.L.S. CD and the children's GAL recommended TPR so that the children could achieve permanency. "Every child is entitled to a permanent and stable home." *Id.* at 608.

We deny this point and affirm the judgments insofar as they terminate Mother's parental rights.